UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------

UNITED STATES OF AMERICA,

                Plaintiff,

    -v-                                                1:17-CV-1168

VICKRAM BEDI, President,
and DATALINK COMPUTER
PRODUCTS, INC.,

                Defendants.

-------------------------------------

VICKRAM BEDI, President,
and DATALINK COMPUTER
PRODUCTS, INC.,

                Counter-Claimants,

    -v-

UNITED STATES OF AMERICA,

                Counter-Defendant.

-------------------------------------

APPEARANCES:                               OF COUNSEL:

HON. GRANT C. JAQUITH                MARY E. LANGAN, ESQ.
United States Attorney for the           Ass't United States Attorney
   Northern District of New York
Attorneys for Plaintiff
100 South Clinton Street, Room 900
Syracuse, NY 13261

U.S. DEPARTMENT OF LABOR           JASON E. GLICK, ESQ.
Office of the Solicitor                      Special Ass't United States Attorney
Attorneys for Plaintiff
201 Varick Street, Room 983
New York, NY 10014

| | |
|---|---|
| CARTER, LEDYARD LAW FIRM | ALAN S. LEWIS, ESQ. |
| Attorneys for Defendants | LEONARDO TRIVIGNO, ESQ. |
| 2 Wall Street | |
| New York, NY 10005 | |

DAVID N. HURD
United States District Judge

## **MEMORANDUM–DECISION and ORDER**

## I. **INTRODUCTION**

On October 19, 2017, plaintiff United States of America (the "Government") filed this civil action against defendants Datalink Computer Products, Inc. ("Datalink"), a computer sales and services company, and Datalink's President Vickram Bedi ("Bedi"), in an effort to collect back wages awarded by the U.S. Department of Labor ("DOL") to former Datalink employee Helga Ingvarsdottir ("Ingvarsdottir"), a native Icelander hired by Datalink through the Immigration and Nationality Act's H-1B visa program.

On January 29, 2018, Datalink and Bedi moved to dismiss the Government's complaint. According to defendants, the Government's debt collection effort was premature because the time for seeking judicial review of the DOL's award under the Administrative Procedure Act ("APA") had not yet expired. Alternatively, they argued the Government could not collect the debt because it is money owed to Ingvarsdottir, not to the United States.

On June 1, 2018, defendants' motion to dismiss was denied. *United States v. Bedi* ("*Bedi I*"), 318 F. Supp. 3d 561 (N.D.N.Y. 2018). After rejecting defendants' threshold assertions about ripeness and estoppel, the Court addressed at length the question of whether the Federal Debt Collection Procedures Act of 1990 ("FDCPA") authorized the Government to pursue the back pay awarded to Ingvarsdottir. *Id*. at 566-67.

*Bedi I* ultimately answered that question in the affirmative. 318 F. Supp. 3d at 567. The analysis began from a simple premise: the FDCPA authorized the Government to institute a civil action in federal court to collect "an amount that is owing to the United States on account of a . . . fine, assessment, penalty, restitution, damages, interest . . . or other source of indebtedness." *Id*. at 566 (citation omitted).

Despite recognizing that the statute carves out an exception for debts "owing under the terms of a contract originally entered into by only persons other than the United States," *Bedi I* agreed with the Government that *Nat'l Labor Relations Bd. v. E.D.P. Med. Comput. Sys., Inc.* ("*E.D.P.*"), 6 F.3d 951 (2d Cir. 1993), provided sufficient support for the legal proposition at the core of this case; *i.e.*, that back pay awarded by the DOL to a non-party employee qualified as a "debt owing to the United States." *Bedi I*, 318 F. Supp. 3d at 567.

On July 12, 2018, defendants moved under 28 U.S.C. § 1292(b) seeking to certify *Bedi I* for interlocutory appeal and for a stay of further proceedings in this forum pending the outcome of that appeal. Defendants again suggested the DOL award could not be collected by the Government because the United States was never party to any employment agreement with Ingvarsdottir. Defendants also doubled down on their assertion that the FDCPA did not authorize this action.

That motion was also denied. *United States v. Bedi* ("*Bedi II*"), 2019 WL 356546 (N.D.N.Y. Jan. 28, 2019). *Bedi II* reiterated this Court's prior conclusion that the Second Circuit's decision in *E.D.P.* permitted the Government to use the FDCPA to pursue the back pay awarded to Ingvarsdottir. *Id*. at *3. After concluding the controlling law was "not

fundamentally uncertain but simply unfavorable to defendants," *Bedi II* denied defendants' motion for § 1292(b) certification. *Id*. at *4 & n.3.

On February 13, 2019, defendants answered the Government's complaint and asserted a counterclaim under the APA. According to defendants' counterclaim, Bedi was denied his constitutional rights during the DOL administrative proceeding because he "was not permitted to be physically present at, nor provided with electronic or other access to, the hearing." Dkt. No. 36.

After multiple mediation sessions failed to produce a negotiated result, the Government filed a copy of the administrative record and the parties cross-moved for summary judgment. Those motions have been fully briefed and will be decided on the basis of the submissions without oral argument.

## II. **BACKGROUND**

The Immigration and Nationality Act ("INA") allows certain non-immigrant aliens to be admitted into the United States on a temporary basis to perform work in speciality occupations. 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1182(n). Among other things, the INA requires an employer seeking to hire a non-immigrant worker to submit to the DOL a Labor Condition Application ("LCA"). § 1184(n)(1).

This LCA must specify the dates of the worker's employment and the wage the employer has agreed to pay. 20 C.F.R. § 655.730(c)(4). The employer must also attest that it will pay the greater of the "prevailing" or the "actual" wage, with the greater of the two being the "required wage." 20 C.F.R. §§ 655.730(d)(1), 655.731(a). After the DOL certifies the LCA, the employer is required to submit for approval a non-immigrant visa petition to the United States Citizenship and Immigration Services. 20 C.F.R. § 655.700(b)(2).

The Secretary of Labor has adopted regulations governing the enforcement of employers' LCA attestations, and has delegated broad enforcement authority to the Administrator of the DOL's Wage and Hour Division ("WHD"). 8 U.S.C. § 1182(n)(2)(a); 20 C.F.R. §§ 655.705(a)(2), 655.805(a)(2). Among other things, the Administrator is authorized to investigate and determine whether an H-1B employer has failed to pay required wages.

During the time period relevant here, Datalink was a corporation that sold and serviced computers out of a storefront in Mount Kisco, New York. Pl.'s Rule 7.1(a)(3) Statement ("Pl.'s Facts"), Dkt. No. 58-2 at ¶ 3; *see also* Administrative Record ("AR"), Dkt. No. 49 at 498, 1218.[1] Bedi was Datalink's President and its sole shareholder. Pl.'s Facts ¶ 4; AR at 498. At some point in late 1999 or early 2000, Bedi hired Ingvarsdottir, a native of Iceland, to speak with customers and to handle administrative work. Pl.'s Facts ¶ 5. Ingvarsdottir worked under Bedi's sole and direct supervision. *Id*. ¶ 6; AR at 675-76.

On March 1, 2005, Bedi, in his capacity as President and on behalf of Datalink, signed an LCA in which he attested that Datalink would pay Ingvarsdottir an annual salary of at least $61,152 to work as an "Account Executive" until May of 2008. Pl.'s Facts ¶ 7; AR at 499, 1255-58; *see also* Defs.' Rule 7.1(a)(3) Statement ("Defs.' Facts"), Dkt. No. 59-2 at ¶ 1. After the DOL certified this first LCA, Datalink received approval for Ingvarsdottir's H-1B visa. Pl.'s Facts ¶¶ 8-9; AR at 499, 1252.

On May 8, 2008, Bedi, in his capacity as President and on behalf of Datalink, signed a second LCA in which he attested that Datalink would pay Ingvarsdottir an annual salary of at least $59,717, this time to work as an "International Account Executive," until May of

---

[1] Pagination is sequential and corresponds with CM/ECF.

2011. Pl.'s Facts ¶ 10; AR at 499, 1264-67. After the DOL certified this second LCA, Datalink received approval to extend Ingvarsdottir's H-1B visa for three more years. Pl.'s Facts ¶¶ 11-12; AR at 499, 1261.

The problem is that Bedi and Ingvarsdottir were not just running a legitimate computer business. They were also engaged in a years-long scheme to defraud a wealthy Datalink client by, *inter alia*, selling him unnecessary services at outrageous prices. Defs.' Facts ¶ 2; AR at 502, 708-11, 1391. Things finally came to a halt in November of 2010, when Bedi and Ingvarsdottir were charged in state court with grand larceny. Defs.' Facts ¶ 3; *see also People v. Ingvarsdottir*, 2013 WL 12097312 (N.Y. Sup. Ct. Apr. 19, 2013). Both parties later pleaded guilty for this misconduct, and Bedi was sentenced to a period of imprisonment for his role in the scheme. Defs.' Facts ¶¶ 4-6; AR at 502.

On March 23, 2012, Ingvarsdottir filed an administrative complaint with the WHD Administrator alleging that she had "receiv[ed] virtually no wages" from Datalink for her work "from 2005 to 2010." Pl.'s Facts ¶ 13; AR at 1630-31. Ingvarsdottir's wage complaint acknowledged she "did not work after Nov[ember of] 2010," the month in which she was arrested, but alleged "there was not an effective termination and therefore non-productive wages [were] due until the end of the" second LCA's period of employment. *Id*.

On August 6, 2012, the WHD Administrator issued a written determination based on its investigation into Ingvarsdottir's wage complaint. Pl.'s Facts ¶ 14; AR at 937-40. As relevant here, the WHD determined that Datalink and Bedi failed to pay Ingvarsdottir in accordance with the provisions set out in the H-1B visa program and assessed back wages in the amount of $237,066.06. AR at 937. The Administrator directed defendants to submit to the DOL a check for the net amount of wages due within fifteen calendar days. AR at

937-38; Defs.' Facts ¶ 7. Otherwise, the decision warned defendants that interest, administrative charges, and other penalties would be assessed on top of the total amount due. AR at 938.

In separate letters dated August 17, 2012, both parties requested a hearing before a DOL administrative law judge. Pl.'s Facts ¶ 16; AR at 1604-13. After the matter was assigned to ALJ Lystra Harris ("ALJ Harris"), the treasurer for Datalink[2] requested an adjournment. Pl.'s Facts ¶¶ 17-18; AR at 1573-80. According to defendants' written submission, Bedi would be unavailable to participate in the proceedings until September of that year and, in any event, they needed more time to obtain legal counsel. AR at 1673-74.

Counsel for Ingvarsdottir objected, pointing out that Datalink's adjournment request omitted a particularly salient fact: Bedi would almost certainly still be unavailable to participate in person by September, since he was due to be sentenced to a term of imprisonment for his crimes. AR at 1564-67.

Although ALJ Harris did not grant defendants' request, the ALJ did extend certain deadlines and reset the hearing for later that summer. AR at 1550-51. Thereafter, defendants obtained attorney Francis O'Reilly as legal counsel, who set to work figuring out how to ensure that Bedi could participate in the hearing from state prison. AR at 857.

During a pre-hearing conference call on July 11, 2013, Attorney O'Reilly informed ALJ Harris that he planned for Bedi to participate telephonically:

> MR. O'REILLY: Your Honor, as you know, my client is incarcerated in Cape Vincent, which is basically on the Canadian border of New York. I may need a subpoena to have him available telephonically. The New York State Department of Corrections is incredibly

---

[2] Chhaya Bedi, Bedi's mother, is treasurer of Datalink.

> cooperative when it comes to legal process in providing inmates
> what they need to address their issues. However, logistically this is
> going to be fairly tough.

AR at 840-41; *see also* Defs.' Facts ¶ 10.

The first day of the hearing took place on July 25, 2013. Pl.'s Facts ¶ 23; AR at 616. After admitting exhibits, ALJ Harris heard testimony from three witnesses: (1) Alex Linden, Ingvarsdottir's certified public accountant; (2) Edward Ritz, an investigator for the WHD; and (3) Ingvarsdottir herself. Pl.'s Facts ¶ 24; AR at 614-721. Bedi was available by phone but did not participate for this day of the hearing, and therefore was unable to see or hear the testimony of the three witnesses or to communicate contemporaneously with his attorney during the proceeding. *See* Pl.'s Response to Defs.' Facts, Dkt. No. 64-1 at ¶ 11.

However, ALJ Harris did hear argument from the parties about what steps would be necessary to ensure Bedi a meaningful opportunity to testify by telephone. AR at 650-57. Ultimately, ALJ Harris chose to reconvene the hearing at a later date specifically for this purpose, since hard copies of exhibits needed to be delivered to Bedi at the prison for effective direct and cross-examination. AR at 650-57, 577.

After the DOL issued a subpoena authorizing Bedi's "telephonic testimony," the hearing reconvened for that purpose on September 17, 2013. Pl.'s Facts ¶¶ 32-33; AR at 456-86. At that time, Bedi testified about a range of matters involving Ingvarsdottir's employment relationship with Datalink. AR at 456-86.

On August 4, 2014, ALJ Harris issued a thorough written decision finding defendants jointly and severally liable for unpaid H-1B back wages to Ingvarsdottir. AR at 488-511. Accordingly, the ALJ ordered defendants to pay Ingvarsdottir $341,693.03 plus pre- and post-judgment interest on the money award. AR at 511.

Thereafter, defendants petitioned the DOL's Administrative Review Board ("ARB") for review of ALJ Harris's written decision. AR at 259-72. Represented by new counsel, defendants raised a host of arguments in this administrative appeal. AR at 146-78. Among other things, defendants argued that Bedi should not have been held individually liable for the back pay award. AR at 173-78. Defendants also argued that they had been denied a fair administrative hearing because of Attorney O'Reilly's ineffective legal assistance. AR at 168-72. Notably, defendants argued that Attorney O'Reilly had failed to adequately prepare Bedi to give his testimony by telephone from prison. AR at 172.

On February 29, 2016, the ARB rejected these arguments and affirmed ALJ Harris's decision with one small modification: it reduced the award to account for three days in 2006 that Ingvarsdottir was unavailable to work. AR at 1-8; Defs.' Facts ¶ 9. Applying that three-day downward adjustment, the ARB assessed an award for $340,987.43, exclusive of interest. Pl.'s Facts ¶ 1. The Government has demanded payment of this sum, but defendants have so far refused. *Id*. ¶ 2; *see also* Ex. A to Compl. (assessing total alleged indebtedness of $455,502.97 as of May 15, 2017).

## III. **LEGAL STANDARD**

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment is a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). And a "genuine" dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

"When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted). Accordingly, summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

"Where, as here, the parties have cross-moved for summary judgment, a reviewing court 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Ward*, 286 F. Supp. 3d at 327 (quoting *Marcano v. City of Schenectady*, 38 F. Supp. 3d 238, 246 (N.D.N.Y. 2014) (McAvoy, J.)). "In undertaking this analysis, it bears noting that 'a district court is not required to grant judgment as matter of law for one side or the other.'" *Id*.

## IV. DISCUSSION

Although they approach the concept from different angles, the parties' dispute revolves around the same basic principle: fairness. The Government, for its part, contends that entering a money judgment against defendants on the final DOL award would be an equitable result because defendants failed to follow the rules and regulations set out in the H-1B visa program. Pl.'s Mem., Dkt. No. 58-1 at 19. Defendants, for their part, insist that it would be unjust to force them to pay Ingvarsdottir as an employee for the time she spent helping to perpetrate the criminal scheme to defraud. Defs.' Mem., Dkt. No. 59-1 at 6, 9.

Defendants argue that even if the law permitted that bizarre result, the DOL back pay award would still be unenforceable because it was procured in violation of Bedi's right to be present at the administrative hearing. *Id*. at 12.

## A. **Defendants' Motion**

As an initial matter, however, defendants have resurrected their assertion that the DOL's back wage award is not a "debt owing to the United States" within the meaning of the FDCPA. Defs.' Mem. at 8-10. This time around, defendants have made a novel attempt to distinguish the applicability of the Second Circuit's holding in *E.D.P. Id*. at 9. They argue that the Second Circuit only let the Government collect the debt owed in *E.D.P.* because the federal agency–plaintiff in that case was the "only party entitled to enforce the backpay award." 6 F.3d at 954. In defendants' view, the reasoning of *E.D.P.* is inapplicable here because Ingvarsdottir could have independently pursued certain state court remedies.

This argument must be rejected. As the Government points out, Ingvarsdottir actually tried to recover in state court, but that forum rejected her claim after concluding that it arose under federal law. *Ingvarsdottir v. Bedi*, 2017 WL 1438265 (N.Y. Sup. Ct. Apr. 24, 2017). Even so, it does not matter what Ingvarsdottir herself could or could not do—the FDCPA independently authorizes the Government to collect on the unsatisfied DOL award here in this forum for the reasons already stated in *Bedi I* and *Bedi II*.

Defendants' second argument again raises the specter of some private employment arrangement between Datalink, Bedi, and Ingvarsdottir. But it is just as meritless. To be sure, the FDCPA contains a limited exception for debts arising from purely private agreements. 28 U.S.C. § 3002(3)(B). And in *Bedi I*, the Court left open the possibility that the existence of a separate employment agreement might become relevant later in these

proceedings. 318 F. Supp. 3d at 568. However, defendants have never produced or identified any private employment agreement with Ingvarsdottir, which as the Government points out would have needed to be in writing given its alleged multi-year duration. Pl.'s Facts ¶ 37; *see also* Pl.'s Opp'n, Dkt. No. 64 at 10 n.4.

Besides, H-1B wages are fixed by statute, not contract, and the employer's violation of the statute is what matters for a back wage award. *See, e.g.*, AR at 499-500; *see also Kutty v. U.S. Dep't of Labor*, 2011 WL 3664476, at *9 (E.D. Tenn. Aug. 19, 2011) ("It does not matter whether the private contracts were inconsistent with the wages listed in the LCAs. The [employees'] H-1B wages were set by statute, not by contract . . . . [r]egardless of the private contracts, [the employer] had to pay the 'required wage' as set forth in the INA.").

Defendants' remaining arguments are no more compelling. Defendants contend that equitable principles bar the Government from helping Ingvarsdottir unfairly benefit at the expense of her co-felons. Defendants rely on *Everet v. Williams*, a bill in equity presented to the Court of Exchequer in England all the way back in the year 1725, to argue that "courts have steadfastly refused to adjudicate claims between felons and have repeatedly made clear that the law leaves quarreling felons with their quarrels." Defs.' Mem. at 11.

*Everet v. Williams* is known today as *The Highwayman's Case*, 9 L.Q. REV. 197 (1893), an appellation first bestowed upon the case by an English law journal more than one hundred years later. Without belaboring the facts underlying the controversy, a robber sought from his partner in crime an accounting of the profits from their joint criminal activity. *Schlueter v. Latek*, 683 F.3d 350, 355 (7th Cir. 2012) (Posner, J.). The court refused to hear the dispute; instead, both parties were hanged for their crimes. *Id*.; *see also United States v. Kravitz*, 281 F.2d 581, 583 n.3 (3d Cir. 1960).

As Judge Posner explained in *Schlueter*, the equitable principle to be derived from *The Highwayman's Case* is that of *in pari delicto*, or perhaps unclean-hands, depending on the precise context in which the defense is raised. 683 F.3d at 355. Whatever the label, though, "[t]he point is only that a court will not adjudicate a case if a judgment for the plaintiff would encourage or reward criminal or other unlawful activity." *Id*.

These equitable defenses do not thwart the Government's FDCPA claim. Courts in this Circuit generally require a party that tries to raise either of these equitable bars to make a threshold showing of a counter-party's "egregious" misconduct, or to demonstrate that the counter-party bears "substantially equal responsibility" for the misconduct. *New York v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 680-81 (S.D.N.Y. 2017), *rev'd in part on other grounds*, 942 F.3d 554 (2d Cir. 2019).

Keeping in mind that the Government, not Ingvarsdottir, is the named plaintiff in this action, defendants have not shown any "egregious" misconduct attributable to the Government, nor have they shown that the Government bears "substantially equal responsibility" for the scheme to defraud. And whether or not the Government stands in Ingvarsdottir's shoes for purposes of assessing these equitable defenses, defendants' argument only makes sense if you conflate one type of misconduct; *i.e.*, the conspiracy to defraud, with a separate type of misconduct that is actually at issue in this case; *i.e.*, defendants' violation of the H-1B visa program's wage requirements.

Defendants also claim that Bedi's constitutional rights were violated when he was excluded from participating in the administrative hearing and forced to testify by telephone. Defs.' Mem. at 12. According to defendants, this arrangement violated Bedi's

"constitutional right to be present at his hearing." *Id*. (citing *Illinois v. Allen*, 397 U.S. 337, 338 (1970)).

This kind of argument fails for a number of independent reasons. First, the Court is not aware of any blanket constitutional right to be present for a civil hearing, especially an administrative one. Defendants, citing *Illinois v. Allen*, invoke the Sixth Amendment for this proposition. But the Sixth Amendment's Confrontation Clause is about safeguarding the rights of defendants in criminal proceedings, not civil ones. *See, e.g., United States v. Flores*, 985 F.2d 770, 781 (5th Cir. 1993) ("[T]he Confrontation Clause applies only in criminal prosecutions and protects only the accused."). Defendants have not offered any reason to conclude the right secured by the Confrontation Clause is applicable at all, much less co-extensive in scope, in the context of a civil administrative proceeding that resulted in an award of money damages.

As the Government points out, defendants are probably looking for the Fifth Amendment's Due Process Clause, which commands that no person shall be deprived of life, liberty, or property without reasonable notice and an opportunity to be heard. *See, e.g.*, *Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007) (Cardamone, J.).

"The opportunity to be heard must be 'at a meaningful time and in a meaningful manner.'" *Karpova*, 497 F.3d at 270 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). "However, the Due Process Clause does not necessarily require that a person be given an opportunity to be heard orally in a testimonial setting; the opportunity for written submissions may be sufficient." *Id*. In other words, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

Measured against that standard, the telephonic arrangement employed by the DOL did not violate Bedi's constitutional rights. Bedi was permitted to testify by telephone before ALJ Harris rendered a decision on Ingvarsdottir's wage complaint. And although he might not have been physically present for the hearing due to his incarceration, Bedi was represented by legal counsel throughout the entire course of the administrative proceedings. 5 U.S.C. § 555(b) ("A party is entitled to appear in person or by or with counsel . . . in an agency proceeding.").

In reply, defendants seem to argue that ALJ Harris was obligated to continue adjourning the matter *seriatim* until Bedi was eventually released from prison. Defs.' Reply, Dkt. No. 67 at 9-10 (explaining that "the request to testify telephonically was made necessary only because Defendants' numerous requests to adjourn the hearing . . . were repeatedly denied"). But defendants have failed to offer any legal support for this argument. Indeed, the Court takes judicial notice of the fact that Bedi was not even released to parole until November 23, 2016, over three years after the administrative hearing in this case took place. In sum, an independent review of the record confirms that there is no valid constitutional concern to be found with the administrative proceedings.

Finally, defendants argue that the DOL award is unenforceable because it is not yet final. Defs.' Mem. at 12. However, as explained in *Bedi I*, the ARB decision is a "final agency action." 318 F. Supp. 3d at 566. The Government has demanded payment of that award and defendants have refused. Pl.'s Facts ¶¶ 1-2. The question of when the Government's FDCPA claim has accrued is separate from the question of how long a defendant has to challenge an agency's action under the APA. *Bedi I*, 318 F. Supp. 3d at 566. The former matters; the latter does not.

### B. Plaintiff's Motion

*Bedi I* and *Bedi II* concluded that the Government is entitled to use the FDCPA to enforce the final administrative decision awarding back wages to Ingvarsdottir. The foregoing discussion explains why defendants' motion for summary judgment must be denied. The only remaining issue is whether the Government has demonstrated its entitlement to judgment as a matter of law on the FDCPA claim.

Under the APA, "judicial review of an agency decision is typically limited to the administrative record." *Kappos v. Hyatt*, 566 U.S. 431, 438 (2012). A reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Although legal conclusions are reviewed *de novo*, § 706, an agency's fact-finding is reviewed under the substantial evidence standard, § 706(2)(E). If the court determines that agency action violated the APA, "the proper course is for the action, findings, and conclusions to be vacated, then remanded to the agency for further administrative proceedings consistent with the court's opinion." *Baiju v. U.S. Dep't of Labor*, 2014 WL 349295, at *8 (E.D.N.Y. Jan. 31, 2014) (citation omitted).

Upon review of the administrative record in accordance with these principles, the Government has established that it is entitled to summary judgment. As the Government correctly details at length in its supporting memorandum, the ARB correctly affirmed ALJ Harris's determination that defendants violated 8 U.S.C. § 1182(n)(1)(A) and 20 C.F.R. § 655.731 when they failed to pay Ingvarsdottir the "prevailing wage" listed in the

LCAs signed by defendants under penalty of perjury. Pl.'s Mem. at 18-24; *see also* AR at 488-511.

In making that determination, ALJ Harris relied on appropriate factors when resolving issues of witness credibility and supported her other factual findings with substantial evidence in the record. AR at 499-505. In addition, ALJ Harris thoroughly analyzed the relevant factors associated with Bedi's complete control over Datalink before concluding that he should be held personally liable for the money judgment. Pl.'s Mem. at 25-27; *see also* AR at 506-08. As the ARB noted, "[w]hile there are many complex facts in this case, the relevant facts are simple." AR at 2. In sum, there is no error to be found in the ARB's order affirming ALJ Harris's decision. AR at 1-8. Accordingly, the Government's motion for summary judgment will be granted.

## V. CONCLUSION

The writing has been on the wall since *Bedi I*, but defendants have managed to stave off judgment for nearly three years simply by taking full advantage of the procedural mechanisms appropriately available to civil defendants in federal court. But time has run out. The Government has established its entitlement to a judgment on the merits. Bedi and Datalink have not.

Therefore, it is

ORDERED that

1. The Government's motion for summary judgment is GRANTED;

2. Defendants' motion for summary judgment is DENIED;

3. Defendants' APA counterclaim is DISMISSED;

4. Defendants are jointly and severally liable for $340,987.43 in back wages, plus pre- and post-judgment interest; and

5. The Government shall submit for consideration, on or before April 20, 2020, a proposed judgment that adequately sets forth any applicable interest calculations, and the date or dates from which any such calculations should run.

IT IS SO ORDERED.

Dated: April 8, 2020
       Utica, New York.

United States District Judge